# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Ridge Park Civic    :
Association                              :    No. 420 C.D. 2019
                                           :    ARGUED: June 9, 2020
Appeal of: Ridge Park Association    :


BEFORE:    HONORABLE RENÉE COHN JUBELIRER, Judge
                    HONORABLE ELLEN CEISLER, Judge (P.)
                    HONORABLE BONNIE BRIGANCE LEADBETTER, Senior Judge


**OPINION BY**
**SENIOR JUDGE LEADBETTER**              **FILED: September 28, 2020**

      Objector, Ridge Park Civic Association,[1] appeals from an order of the Court of Common Pleas of Philadelphia County affirming the decision of the City of Philadelphia's Zoning Board of Adjustment, which granted the application for use and dimensional variances filed by Applicants, David Henderson and Pasquale Bianculli.[2] We vacate the trial court's order and remand for further proceedings.

      The property at issue consists of two adjacent parcels located at 6995 and 6997 Pechin Street in the City's Roxborough section. At 6995 Pechin Street, there is one single-family ranch house built in 1951. (Board's May 16, 2018 Decision, Finding of Fact "F.F." Nos. 1 and 6.) The parcels are zoned RSA-2 Residential, which stands for "residential single-family attached-2" under the Philadelphia Zoning Code (Zoning Code). Zoning Code § 14-401(1)(a). Applicants

---

[1] It appears that Objector inadvertently omitted the word "Civic" from the caption of its April 2019 notice of appeal to this Court. *See*, *e.g.*, Objector's May 3, 2019 Docketing Statement ¶ 4 reciting, "Appellant Ridge Park Civic Association filed a timely Notice of Appeal to the Commonwealth Court."

[2] In November 2019, the City of Philadelphia filed a notice of non-participation.

proposed consolidating the two parcels, demolishing the existing house, and erecting nine single-family townhomes in three sets of three. Each three-story townhome would consist of approximately 2100 square feet of floor space and, *inter alia*, have four bedrooms, a basement, a porch, and one parking space per unit. (F.F. Nos. 1, 9 and 11.) The development would feature one main vehicular entrance/exit and one parking space for handicapped accessibility. (F.F. No. 6.) In addition, a homeowners' association would be formed. (F.F. No. 9.)

The City's Department of Licenses and Inspections refused the application. (Department's Feb. 13, 2018 Refusal; Reproduced Record "R.R." at 178-79.) The Department refused the request because Applicants proposed three structures, with three townhomes in each structure, whereas the zoning district permits no more than one principal structure per lot and prohibits multi-family use. Zoning Code § 14-401(4)(a). By right, Applicants could build one single-family home on each lot. The Department refused the request for dimensional variances because a front setback of forty-seven feet is required whereas Applicants proposed a seventeen-foot setback and a maximum curb cut width of twelve feet is permitted whereas Applicants proposed a sixteen-foot curb cut. (F.F. No. 2.)

On appeal to the Board, Applicants described the property "as an elongated lot with narrow frontage along Pechin Street and as adjacent at its rear lot line 'to a commercial financial institution which changes the nature and tenor of the neighborhood.'"[3] (F.F. No. 3.) At the hearing, Applicants sought to establish undue hardship due to the property's unique circumstances. They presented the testimony of David Henderson, one of the owners; Raymond Tran, a real estate broker; Joseph Mulvihill, a licensed professional engineer; and Pasquale Pellicciotti, general

---

[3] (Applicants' March 13, 2018 Appeal to the Board; R.R. at 173-77.)

2

contractor for the project. Henderson testified as to the overall details of how the development would be structured and what it would include. (F.F. Nos. 9-11.) Tran testified as to the lack of availability of the type of houses proposed. (F.F. No. 32.) Mulvihill testified as to the geotechnical issues that rendered the property challenging for building purposes and presented a report pertaining to the need for a constructive foundation consisting of a pillar-pier foundation system. (F.F. Nos. 16-18 and 22-23.) Pellicciotti testified that each pier would cost about $6800, that 147 piers would be required, and that the total cost of the piers and foundations would be a little less than $1.135 million. (F.F. Nos. 27 and 28.)

By way of opposition, Objector's vice president, Marlene Schleifer, testified that the neighborhood consisted of detached single-family homes and that the proposed development was "too much density for this space." (F.F. Nos. 36 and 37.) Previously, Objector had suggested to Applicants that four homes would be appropriate. (F.F. No. 34.) A City Planning Commission representative, Martin Gregorski, testified as to the agency's position that nine units constituted an overuse of the property. (F.F. No. 42.) Additionally, two neighbors testified. Of note, one of them testified that several of the neighbors had plans to buy the property twenty years ago to extend their respective yards but had not intended to build anything due to the soil issues and the cost of pilings. (F.F. Nos. 40 and 41.)

Subsequently, the Board unanimously voted to grant the application. Without taking additional evidence, the trial court affirmed. In so doing, the trial court determined that the variance criterion pertaining to the minimum variance necessary to afford relief (minimum variance criterion or minimization requirement) was inapplicable to use variances despite the provision in Section 14-

3

303(8)(e)(.1)(.b) of the Zoning Code to the contrary. Objector's appeal to this Court followed.[4]

Pursuant to the Zoning Code:

> The . . . Board shall grant a variance only if it finds each of the following criteria are satisfied:
>
> > (.a) The denial of the variance would result in an unnecessary hardship. The applicant shall demonstrate that the unnecessary hardship was not created by the applicant and that the criteria set forth in [Zoning Code] § 14-303(8)(e)(.2) (Use Variances) below, in the case of use variances, or the criteria set forth in [Zoning Code] § 14-303(8)(e)(.3) (Dimensional Variances) below, in the case of dimensional variances, have been satisfied;
> >
> > (.b) *The variance, whether use or dimensional, if authorized will represent the minimum variance that will afford relief and will represent the least modification possible of the use or dimensional regulation in issue*;[5]
> >
> > (.c) The grant of the variance will be in harmony with the purpose and spirit of this Zoning Code;
> >
> > (.d) The grant of the variance will not substantially increase congestion in the public streets, increase

---

[4] Where the trial court takes no additional evidence, we are limited to determining whether the Board committed an error of law or made findings of fact which are not supported by substantial evidence. *Pequea Twp. v. Zoning Hearing Bd. of Pequea Twp.*, 180 A.3d 500, 504 (Pa. Cmwlth. 2018). Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion. *Id.* If the record contains substantial evidence, this Court is bound by the Board's findings that result from the resolution of credibility and conflicting testimony. *Pohlig Builders, LLC v. Zoning Hearing Bd. of Schuylkill Twp.*, 25 A.3d 1260, 1266 (Pa. Cmwlth. 2011).

[5] In 2013, City Council amended the Zoning Code to clarify that the minimum variance criterion applied to *both* use and dimensional variances.

4

the danger of fire, or otherwise endanger the public health, safety, or general welfare;

(.e) The variance will not substantially or permanently injure the appropriate use of adjacent conforming property or impair an adequate supply of light and air to adjacent conforming property;

(.f) The grant of the variance will not adversely affect transportation or unduly burden water, sewer, school, park, or other public facilities;

(.g) The grant of the variance will not adversely and substantially affect the implementation of any adopted plan for the area where the property is located; and

(.h) The grant of the variance will not create any significant environmental damage, pollution, erosion, or siltation, and will not significantly increase the danger of flooding either during or after construction, and the applicant will take measures to minimize environmental damage during any construction.

Zoning Code § 14-303(8)(e)(.1)(.a)-(.h) (emphasis added) (footnote added).

With regard to use variances in particular, the Zoning Code provides:

To find an unnecessary hardship . . . the . . . Board must make all of the following findings:

(.a) That there are unique physical circumstances or conditions (such as irregularity, narrowness, or shallowness of lot size or shape, or exceptional topographical or other physical conditions) peculiar to the property, and that the unnecessary hardship is due to such conditions and not to circumstances or conditions generally created by the provisions of this Zoning Code in the area or zoning district where the property is located;

5

> (.b) *That because of those physical circumstances or conditions, there is no possibility that the property can be used in strict conformity with the provisions of this Zoning Code and that the authorization of a variance is therefore necessary to enable the viable economic use of the property*;
>
> (.c) That the use variance, if authorized, will not alter the essential character of the neighborhood or district in which the property is located, nor substantially or permanently impair the appropriate use or development of adjacent property, nor be detrimental to the public welfare; and
>
> (.d) That the hardship cannot be cured by the grant of a dimensional variance.

*Id.*, § 14-303(8)(e)(.2)(.a)-(.d) (emphasis added).[6]

As for dimensional variances, the Zoning Code states that "[t]o find an unnecessary hardship . . . the . . . Board may consider the economic detriment to the applicant if the variance is denied, the financial burden created by any work necessary to bring [any existing] building into strict compliance with the zoning requirements[,] and the characteristics of the surrounding neighborhood." *Id.*, § 14-303(8)(e)(.3).

Objector first challenges the trial court's alternative holding that the minimum variance criterion is inapplicable to use variances.[7] We agree that this

---

[6] In the present case, the criteria found in Section 14-303(8)(e)(.2) of the Zoning Code essentially mirror the ones found in Section 910.2 of the Pennsylvania Municipalities Planning Code (MPC), Act of July 31, 1968, P.L. 1329, *as amended*, added by Section 89 of the Act of December 21, 1988, P.L. 1329, 53 P.S. § 10910.2, and those found in the ordinances of most municipalities. Moreover, the minimization requirement stated in the MPC simply refers to variances, and does not in any way suggest that it relates only to dimensional variances.

[7] (Trial Court's Aug. 1, 2019 Op. at 6.) The court stated that its decision was primarily based on a determination that the minimum variance criterion was satisfied. (*Id*. at 5-6.)

determination is erroneous. As noted, Section 14-303(8)(.e)(.1)(.b) of the Zoning Code specifically provides that the minimum variance criterion is applicable to *both* use and dimensional variances. Additionally, even absent the language in the City's Zoning Code, this Court recently clarified that the minimum variance criterion applied to use variances. *Paganico v. Zoning Hearing Bd. of the Municipality of Penn Hills*, 227 A.3d 949, 954 (Pa. Cmwlth. 2020); *see also Zelienople Borough v. Zelienople Borough Zoning Hearing Bd.* (Pa. Cmwlth., No. 671 C.D. 2019, filed June 23, 2020), slip op. at 11 (analyzed whether applicant's testimony was sufficient to support conclusion that use variance satisfied minimum variance criterion) and *Upper Roxborough Civic Ass'n v. Zoning Bd. of Adjustment, City of Phila.* (Pa. Cmwlth., No. 372 C.D. 2019, filed May 4, 2020), slip op. at 18 n.10 (characterized trial court's ruling that the Zoning Code's minimum variance criterion was inapplicable to use variances as irrelevant and/or harmless error).[8]

As a practical matter, the minimum variance criterion applies to use variances despite the fact that, generally, "a use variance marks a qualitative rather than a quantitative departure from an existing ordinance" and "a minimum variance is [more] difficult to assess in use variance cases [than in] dimensional variance cases[.]" *Paganico*, 227 A.3d at 954-55. In other words, the minimum variance criterion is more readily and practically applicable to quantifiable restrictions, such as dimensional requirements (*i.e.*, distance or size), rather than those that are not quantifiable, as are most use restrictions (*i.e.*, types of development). *See S. of S. St. Neighborhood Ass'n v. Phila. Zoning Bd. of Adjustment*, 54 A.3d 115, 124 (Pa.

---

[8] Pursuant to Section 414(a) of this Court's Internal Operating Procedures, unreported decisions are not binding precedent but may be cited for persuasive value. 210 Pa. Code § 69.414(a).

Cmwlth. 2012).[9]  Of course, whether an applicant satisfies the minimum variance criterion is fact dependent and grounded in an analysis as to whether the accepted evidence constitutes substantial evidence.

Several cases provide guidance for assessing the minimum variance criterion in the context of use variances.  In *Paganico*, Veterans Place sought a use variance to build a group care facility and fourteen micro homes for homeless veterans on property zoned R-1 Residential in Penn Hills.  The triangular-shaped property, consisting of 3.7 acres of vacant land with uneven topography and a centrally located sewer easement, formerly served as a sewage treatment plant and currently as a dump for fill.  In determining that the use variance satisfied the minimum variance criterion, we noted the zoning hearing board's reliance on testimony to the effect that the proposed use was less intensive than a multitude of conditional uses permitted under the ordinance at issue and would have a minimal impact on the use of neighboring property.  In other words, because the proposed use of a group care facility was substantially similar to permitted conditional uses such as a church or a non-profit community facility, it was deemed to have a minimal impact on the use of neighboring property.  *Paganico*, 227 A.3d at 955.  Thus, once it is established that use of the property in strict conformance with the ordinance is not viable, the minimum variance criteria is met by showing that of all the viable alternatives, the proposed use is the least departure from the terms of the ordinance, or the most similar to the uses in the surrounding neighborhood.

In addition, in *Paganico* we cited the zoning hearing board's rationale for determining that the granted variance satisfied the minimum variance criterion:

_____

[9] *Disapproved on other grounds by Scott v. City of Philadelphia Zoning Board of Adjustment*, 126 A.3d 938 (Pa. 2015).

8

[1] Residential uses were not possible . . . [due to excavation costs related to uncompacted fill full of large construction materials and the sewer easement] . . . . Conditional uses are not possible consistent with the [ordinance] . . . . The same problems apply to special exceptions such as funeral home[s] or Planned Residential Developments. Senior Citizen housing is not economically feasible . . . .

[2] A traffic study was presented . . . that established that the development will have a negligible effect on the area. . . . .

[3] The proposed use . . . is essentially residential. The only non-residential aspect of this use is the group care building, but this use is generally consistent with the residential character of the neighborhood.

*Id.* at 956.

*Zelienople Borough*, decided subsequent to *Paganico*, is also instructive. In *Zelienople Borough*, the applicant sought to construct a single-story duplex on two vacant and undersized parcels where a duplex was neither a permitted nor a conditional use under the Borough's ordinance. The applicant testified that the project was consistent with maintaining the essential character of the neighborhood and not detrimental to the public welfare because the duplex would look very similar to other dwellings in the zoning district and there would be 1000 square feet on each side with a garage in the front. Additionally, he opined that the duplex would be nice looking, testifying: "[R]ight now, it's just an empty lot. It would be as nice [] looking as the apartment building that it's going to be right next to . . . . And . . . there [are] a lot of smaller homes on that street . . . . [I]t would be in line with what's in the neighborhood now and across the street . . . ." *Zelienople Borough*, slip op. at 9. The zoning hearing board accepted the testimony as support for its conclusion that the requested use variance satisfied the minimum variance criterion, reasoning

9

that it was the minimal variance necessary to make a reasonable use of the two undersized lots. Reciting that a use variance marks a qualitative rather than a quantitative departure from an existing ordinance, we agreed with the zoning hearing board that the applicant's testimony was sufficient. In so concluding, we reasoned:

> Allowing a duplex on two lots after they are combined into one does not increase the density of use over the permitted single-family home on each of the two lots. Since single-family homes cannot be built on the two undersized lots, allowing a single duplex on the larger merged lot is the minimum variance necessary to afford relief.

*Zelienople Borough*, slip op. at 11.

In the present case, Applicants sought a change in the intensity of the permitted residential use of the property but not a change in the nature of the permitted use. Once the Board determined that a use variance was "necessary to enable the viable economic use of the property[,]"[10] it had to ascertain the extent of any variance authorized. Unlike the cases in which a use variance entails only a qualitative departure from the terms of the ordinance, this case, like *Zelienople Borough,* involves a quantifiable departure. Here, such a determination entailed ascertaining how many units were necessary for Applicants to build given the cost of developing in an area with undisputed geotechnical issues. In other words, the inquiry required resolution of the factual issue of a reasonable profit and the minimum number of units necessary for it to be economically feasible to proceed.

In unanimously voting to grant Applicants' application, the Board concluded:

---

[10] *See* Zoning Code § 14-303(8)(e)(.2)(.b).

10

10. The Property presents significant, well[-] documented geotechnical issues that impede and significantly increase the costs of development.

11. The Board found the testimony of [Applicants'] witnesses to be credible, persuasive, and largely uncontradicted. The testimony established that the Property, due to unique physical conditions, cannot be developed in strict compliance with Zoning Code requirements.

. . . .

14. The Board additionally concludes that the variances requested are the minimum necessary to afford relief, and that the development will not detrimentally impact the public health, safety or welfare.[11]

15. With respect to the "minimum necessary" requirement, the Board notes that Applicants are proposing a residential use in a residentially zoned zoning district. While classified as "multi-family" because more than one home will be constructed on a single zoning lot, the proposed structures will be laid out as single-family homes with individual entrances.

16. Other factors considered by the Board in determining the development is the minimum necessary to afford relief include revisions made by Applicant[s] in response to neighborhood input and the project's compliance with applicable bulk and height restrictions. With respect to the proposed curb cut, the Board notes that the proposed width exceeds the permitted maximum by only four feet, that Applicants worked with the Planning Commission in designing the parking layout and driveway, and that the development will have a single curb cut for vehicular ingress and egress.

---

[11] The Board concluded that the development would not present a negative impact, citing extensive landscaping, an open area of 61%, and green elements designed to prevent stormwater runoff onto surrounding properties. (Conclusion of Law "C.L." No. 17.) These elements include "green roofs and porous driveways constructed of material that 'allows the water to seep through,' and 'eliminates all the runoff from the property.'" (F.F. No. 21.)

11

(Conclusions of Law "C.L." Nos. 10, 11, 14-16) (footnote added). Additionally, the Board found:

22. With regard to the required setback variance, [Applicants' counsel] referred to test pier results showing "the shallowest depth you were gonna have to drop to [was] 38 feet the closer you were to Pechin Street." He then asked [Applicants' engineer] if it was possible to extrapolate from the test results that "as you get closer to Pechin Street . . . you may not have to go as deep with the piers?" [The engineer] replied: ["]It's very possible, because there's a difference of 38 going up to 52 feet, . . . a 14-foot difference.["] 5/16/2018 [Notes of Testimony] N.T. at 39-40 [R.R. at 74-75].

23. When asked by [counsel] if it was correct that "if you are closer to Pechin Street, where … you drop the piers, then you are at least not disturbing as much earth," [the engineer] agreed that "would be correct, based on the pier depth." 5/16/2018 N.T. at 39-40 [R.R. at 74-75].

. . . .

25. Mr. Pellicciotti testified that he had experience working in the Roxborough area and had worked with Mr. Mulvihill on projects for "numerous sites."

. . . .

27. When questioned by [Applicants' counsel] regarding the "challenges" related to developing the Property, Mr. Pellicciotti testified that each pier required for the development would cost approximately $6,800.00. 5/16/2018 N.T. at 43 [R.R. at 78].

28. Mr. Pellicciotti testified that the proposed construction would require a total of 147 piers, and that the costs "[j]ust for the piers and foundations" would be "a little less" than the 1.135 million dollars estimate

suggested by [Applicants' counsel]. 5/16/2018 N.T. at 44 [R.R. at 79].

29. Mr. Pellicciotti testified that utilities for the development would involve "a lot of engineering." He specifically noted:

> The utilities also will sit on these helical piers. There'll be a channel cut out and there'll be like a concrete encasement, and then a concrete encasement will actually sit on the helical piers and the gas, electric, sewer will run through.

5/16/2018 N.T. at 46 [R.R. at 81].

30. Regarding the existing building at the site, Mr. Pellicciotti said the "foundation is good, but everything else would have to be torn down. He agreed that the building "doesn't have modern-day electrical systems and HVAC systems." 5/16/2018 N.T. at 45-46 [R.R. at 80-81].

31. On cross examination, [Objector's counsel] questioned Mr. Pellicciotti regarding his conclusions that the existing building's foundation was good but construction on the remainder of the site would require piers. Mr. Pellicciotti, explaining the seeming inconsistency, testified:

> The foundation for this home, okay, is shallow, because it's almost on bedrock. Because in that particular area, just like the whole of Roxborough, you never know what you're gonna hit. But in that area when they built that home 51 years ago, they built it on bedrock. Now, the other parts that are to the left of it and to the right of it and straight back is all fill.

5/16/2018 N.T. at 51 [R.R. at 86].

13

(F.F. Nos. 22, 23, 25, and 27-31.)

In granting the use variance for the requested number of houses, the Board afforded great weight to the undisputed evidence pertaining to the cost of dealing with the challenging geotechnical issues that it concluded would "impede and significantly increase the costs of development." (C.L. No. 10.) In other words, the Board weighed and accepted Applicants' evidence in concluding that the number of units proposed in the initial application satisfied the minimum variance criterion. Moreover, the Board focused on the fact that the proposed multi-family use would remain residential and that the appearance of the townhomes would be similar to single-family homes with separate entrances. This Court endorsed reliance upon this qualitative factor in recent cases where we determined that the respective zoning hearing boards did not err in concluding that the minimum variance criterion was met. *See Paganico*, 227 A.3d at 956 (approving the board's reliance on the fact that the proposed use of micro homes was essentially residential and that the group care building was generally consistent with the residential character of the neighborhood); *Zelienople Borough*, slip op. at 10 (approving the board's reliance on applicant's testimony that the proposed duplex would look very similar to other dwellings in the zoning district); and *Upper Roxborough Civic Ass'n*, slip op. at 17 (approving the board's reliance on the fact that the proposed development was "designed to mimic the single-family massing of nearby residential properties").

Turning next to the requested dimensional variance for the front setback requirement, we note that Applicants' engineer testified that the boring and the nature of the soil prevents the property from having the required forty-seven foot setback for the project as proposed. Specifically, due to the fluctuation in the depth of the fill, a contractor probably would not have to place the piers as deep closer to

14

Pechin Street. (May 16, 2018, Hearing, N.T. at 38-40; R.R. at 73-75.) Even though there is no exact evidence to support a determination that precisely seventeen feet satisfied the minimum variance criterion, Applicants presented copious evidence that it would be more cost effective to build without the required setback and the Board accepted that evidence.

As for granting the dimensional variance from a maximum curb cut width of twelve feet to sixteen feet, the Board reasoned that the proposed width exceeded the permitted maximum by only four feet, that Applicants worked with the Planning Commission in designing the parking layout and driveway, and that the development would have a single curb cut for vehicular ingress and egress. (C.L. No. 16.)

The Board's factual findings are fully supported and the record makes clear that the property could not be viably developed in accordance with the strict terms of the Zoning Code. Moreover, the factors it cited are clearly relevant and would provide support for its conclusion that the variances are the minimum necessary if they were of the sort lacking any quantifiable measure. Here, however, in addition to the pertinent qualitative factors, the necessary departure from the measurable requirements must also be established. The trial court did not take additional evidence to amplify the record, apparently because of its erroneous view that the minimization doctrine did not apply to use variances. Given the costs inherent in such a project, including the purchase price and engineering costs related to challenging geotechnical issues, as well as the extraordinary costs for the necessary helical piers, it does not seem unlikely that nine units is the minimum number needed to afford relief. Similarly, the testimony that the farther from the road the townhomes were placed, the deeper the bore for the piers would have to go

15

and the more earth that would have to be displaced, the reduced setback may well be justified. However, we cannot substitute our guess as to what is likely for actual proof.

Accordingly, we must remand to the trial court to make appropriate findings as to the quantitative aspects of the minimum variances necessary for this to be a viable project. For the above reasons, therefore, we vacate the trial court's order and remand for further proceedings consistent with the foregoing opinion.

_____
**BONNIE BRIGANCE LEADBETTER,**
Senior Judge

# IN THE COMMONWEALTH COURT OF PENNSYLVANIA

In Re: Appeal of Ridge Park Civic : 
Association : No. 420 C.D. 2019
 :
Appeal of: Ridge Park Association :

# **O R D E R**

AND NOW, this 28th day of September, 2020, the order of the Court of Common Pleas of Philadelphia County is hereby VACATED, and the matter is REMANDED for further proceedings in accordance with the foregoing opinion. Jurisdiction is relinquished.

_____

**BONNIE BRIGANCE LEADBETTER,**
Senior Judge